**CROSNER LEGAL, P.C.**
Craig W. Straub (State Bar No. 249032)
*craig@crosnerlegal.com*
Zachary M. Crosner (State Bar No. 272295)
*zach@crosnerlegal.com*
9440 Santa Monica Boulevard, Suite 301
Beverly Hills, California 90210
Telephone: (866) 276-7637
Facsimile: (310) 510-6429

**REESE LLP**
George V. Granade (State Bar No. 316050)
*ggranade@reesellp.com*
8484 Wilshire Boulevard, Suite 515
Los Angeles, California 90211
Telephone: (310) 393-0070
Facsimile: (212) 253-4272

**REESE LLP**
Michael R. Reese (State Bar No. 206773)
*mreese@reesellp.com*
100 West 93rd Street, 16th Floor
New York, New York 10025
Telephone: (212) 643-0500
Facsimile: (212) 253-4272

*Counsel for Plaintiff Valerie Perkins
and the Proposed Class*

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VALERIE PERKINS, *individually and on behalf of all others similarly situated*,<br><br>Plaintiff,<br><br>v.<br><br>THE PROCTER & GAMBLE COMPANY,<br><br>Defendant. | Case No. 3:25-cv-01305-TWR-VET<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>Judge: Hon. Todd W. Robinson<br><br>Action Filed: February 28, 2025<br>Action Removed: May 21, 2025<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Valerie Perkins ("Plaintiff" or "Perkins") brings this First Amended Class Action Complaint against Defendant The Procter & Gamble Company ("Defendant" or "P&G"), and alleges upon personal knowledge as to her acts and experiences, and, as to all other matters, upon information and belief, including investigation by her attorneys, as follows.

## INTRODUCTION

1. P&G manufactures, markets, advertises, and sells a line of "ZzzQuil PURE Zzzs" melatonin products with the tagline "HELPS YOU FALL ASLEEP NATURALLY" (the "Product" or "Products"). Each Product label highlights this tagline on the front of the label in all caps and bolded green lettering. An image of an example Product label is below.



Exemplars of the Products' front and back labeling are attached hereto as **Exhibit 1**.

2.     The marketing claim "helps you fall asleep naturally" conveys to the ordinary consumer that the active ingredient is derived from a natural source (plant/biological) and processed minimally. P&G also uses the "naturally" branding strategy and labeling claim as the primary feature differentiating the Products from other sleep-aid products in the marketplace.

3.     A recent consumer survey of more than 400 consumers nationwide conducted by an independent third party shows that 76.4% of those surveyed believed, based on the Product labeling, that the Product contains natural (instead of synthetic) melatonin (survey question 10). The same survey reveals that 65.4% of those surveyed would be more likely to purchase a sleep aid/supplement product if the primary ingredient was natural instead of synthetic (survey question 12). Screenshots of the survey are attached hereto as **Exhibit 2**.

4.     However, P&G's "naturally" advertising and marketing is false, deceptive, and misleading because the Products' active primary ingredient, Melatonin, is an artificial and synthetic ingredient. The Melatonin in the Products is a highly synthesized chemical which does not exist in nature and is not made by nature, and thus, does not help one fall asleep "naturally." It is made in a lab and requires the use of toxic solvents and chemical catalysts. Since the melatonin ingredient is not "natural," it cannot "naturally" help a consumer sleep.

5.     Perkins relied on P&G's representation that the Products' active ingredient, Melatonin, works "naturally" and is not synthetic or artificial, and that representation was material to the decisions of Perkins and the other members of the Class (defined below) to purchase the Products. The "naturally" branding strategy and labeling representation is key to the marketing and sale of the Products, which is why P&G places the "naturally" advertising claim in bolded green lettering and capitalized font on the front and center of the label.

6.     P&G chose green, a color known to refer to nature, as the color of the font for the "naturally" representation. The label also includes images to enhance

FIRST AMENDED CLASS ACTION COMPLAINT

the "naturalness" of the Products including chamomile and lavender. The net-effect or net-impression of the Products' labeling on consumers is that the Products do not contain an active ingredient that is synthetic, artificial, and subject to significant chemical modification and processing. Reasonable consumers are deceived into thinking the primary ingredient of the Products (Melatonin) is not synthetically made.

7.    A reasonable consumer would expect that a Product branded and labeled as "naturally" being capable of inducing sleep would not contain a synthetic, artificial active ingredient. Reasonable consumers do not believe that a highly processed synthetic hormone can influence the body "naturally." A synthetic chemical does not and cannot "naturally" help you fall asleep. Accordingly, P&G's "naturally" representation is false, misleading, and likely to deceive reasonable consumers. P&G's advertising and marketing campaign is designed to cause consumers to purchase the Products as a result of this deceptive message.

8.    Listed below are many of the Products,[1] including the primary and "other ingredients" listed on the label:

a.    **Melatonin + Chamomile & Lavender Tablets** (60 count) (Exhibit 1 at 1):

Primary Ingredients: Melatonin and PURE Zzzs Blend [Chamomile (*Matricaria recutita L.*) flower extract, lemon balm (*Melissa officinalis L.*) leaf extract, valerian (*Valeriana officinalis L.*) root extract, lavender (*Lavandula officinalis Chaix*) flower extract].

Other Ingredients: Microcrystalline cellulose, croscarmellose sodium, calcium phosphate, maltodextrin, corn starch; Less than

---

[1] P&G may have sold other Products during the statute of limitations period of which Plaintiff is unaware, including other Product sizes/counts.

2% of: Magnesium stearate, silicon dioxide, polyvinyl alcohol, polyethylene glycol, titanium dioxide, talc, Red 40 Lake, Blue 2 Lake.

b. **Melatonin + Chamomile & Lavender Gummies** (24, 30, 48, 72, and 110 count) (Exhibit 1 at 2-4):

Primary Ingredients: Melatonin and PURE Zzzs Blend [Chamomile (*Matricaria recutita L.*) flower extract, lemon balm (*Melissa officinalis L.*) leaf extract, valerian (*Valeriana officinalis L.*) root extract, lavender (*Lavandula officinalis Chaix*) flower extract].

Other Ingredients: Corn syrup, water, sugar; Less than 2% of: hydrogenated coconut oil, pectin, maltodextrin, citric acid, sodium potassium tartrate, soy lecithin, natural flavor, sodium citrate, malic acid, sodium polyphosphate, Red 40, Blue 1.

c. **Enhanced Formula Melatonin** (100 count) (Exhibit 1 at 5):

Primary Ingredients: Melatonin and PURE Zzzs Blend [Chamomile (*Matricaria recutita L.*) flower extract, lemon balm (*Melissa officinalis L.*) leaf extract, valerian (*Valeriana officinalis L.*) root extract, lavender (*Lavandula officinalis Chaix*) flower extract].

Other Ingredients: Corn syrup, water, sugar; Less than 2% of: hydrogenated coconut oil, pectin, natural flavors, maltodextrin, sodium potassium tartrate, citric acid, soy lecithin, sodium citrate, malic acid, sodium polyphosphate, Red 40, Blue 1.

d. **Sleep + Muscle Relaxation Gummies** (26 and 42 count) (Exhibit 1 at 6):

Primary Ingredients: Melatonin and Proprietary Blend [Chamomile (*Matricaria recutita L.*) flower extract, lavender

(*Lavandula officinalis Chaix*) flower extract].

Other Ingredients: Corn syrup, sucrose, water; Less than 2% of: agar, natural flavors, fumaric acid, tapioca starch, citric acid, vegetable juice (color), locust bean gum.

e.  **Sleep + Next Day Energy Tablets** (21 count, 28 count, and two 28 count) (Exhibit 1 at 7)**:**

Primary Ingredients: Melatonin and PURE Zzzs Blend [Chamomile (*Matricaria recutita L.*) flower extract, lavender (*Lavandula officinalis Chaix*) flower extract].

Other Ingredients: Calcium carbonate, microcrystalline cellulose, maltodextrin, hydroxypropyl methylcellulose; Less than 2% of: stearic acid, magnesium stearate, croscarmellose sodium, silicon dioxide, turmeric (color), hydroxypropyl cellulose, vegetable juice (color).

f.  **Back to Sleep Tablets** (Exhibit 1 at 8)**:**

Primary Ingredients: Melatonin.

Other Ingredients: D-Mannitol, microcrystalline cellulose, povidone, xylitol., dicalcium phosphate; Less than 2% of: silicon dioxide, magnesium stearate, acesulfame potassium, natural flavor, citric acid (flavor enhancer).

g.  **Kidz Melatonin + Chamomile & Lavender Gummies** (Exhibit 1 at 9-10)

Primary Ingredients: Melatonin and PURE Zzzs Kidz Blend [Chamomile (*Matricaria recutita L.*) flower extract, lavender (*Lavandula officinalis Chaix*) flower extract].

Other Ingredients: Corn syrup, water, sugar; Less than 2% of: hydrogenated coconut oil, pectin, natural flavors, maltodextrin, sodium potassium tartrate, citric acid, soy lecithin, sodium

citate, malic acid, sodium polyphosphate, Red 40, Blue 1.

9.     Plaintiff brings this action individually and on behalf of other similarly situated consumers in California to halt the dissemination of P&G's false and misleading advertising message, correct the false and misleading perception it has created in the minds of consumers, and obtain redress for those who have purchased the Products. As a consequence of P&G's deceptive labeling of the Products, Perkins alleges P&G has violated and is violating California's Consumers Legal Remedies Act, CAL. CIV. CODE § 1750 *et seq.* (the "CLRA"), and California's Unfair Competition Law, CAL. BUS. & PROF. CODE § 17200 *et seq.* (the "UCL").

## JURISDICTION AND VENUE

10.     In P&G's Notice of Removal, it contends that this Court has jurisdiction pursuant to 28 U.S.C. §§ 1332(d), 1441, and 1446. *See* ECF No. 1.

11.     This Court has personal jurisdiction over P&G because P&G conducts and transacts business in the State of California, contracts to supply goods within the State of California, and supplies goods within the State of California. P&G, on its own and through its agents, is responsible for the formulation, ingredients, manufacturing, labeling, marketing, and sale of the Product in California, specifically in this county. The marketing of the Product, including the decision of what to include on the label, emanates from P&G. P&G maintains distribution centers in California and employs numerous employees in California. Thus, P&G has intentionally availed itself of the markets within California through its advertising, marketing, and sales of the Product to consumers, including Perkins.

12.     Venue is proper in this county pursuant to California Civil Code section 1780(d) because Defendant is domiciled in this county and is also doing business in this county as the Products are offered for sale in this county. *See also* Civil Code Section 1780(d) Affidavit below. Plaintiff purchased the Product at issue in this county. P&G maintains that venue is proper in the Court under 28 U.S.C. §§ 84(a) and 1441(a) because this Court embraces the Superior Court for San Diego County,

where this action was originally filed. *See* ECF No. 1 at ¶ 9.

## **PARTIES**

13.    Plaintiff Valerie Perkins is a citizen of and resides in California. Throughout 2022, Ms. Perkins purchased P&G's ZzzQuil Pure Zzzs Products in the tablet and gummy forms which had the "helps you fall asleep naturally" label for approximately $15 per bottle at retail stores in El Cajon, California. When purchasing the Products, Perkins was exposed to, read, and relied on the "naturally" representation that was prominently displayed in green font on the Product's front label. At the time she made her purchases, Perkins believed that P&G's ZzzQuil Pure Zzzs "naturally" labeled Product worked "naturally," i.e., free of synthetic active ingredients, and that the primary ingredient of the Products, Melatonin, was not a synthetically created substance. Perkins relied on P&G's representation that the ZzzQuil Pure Zzzs "naturally" labeled Product helped her sleep "naturally," and she would not have purchased the Products or would have paid less for the Products if she had known they do not work naturally but, instead, contained a synthetic hormone as the active ingredient. Perkins was injured in fact and lost money as a result of P&G's deceptive advertising.

14.    Perkins would continue to purchase the Products at issue if they in fact contained only natural active ingredients that, by definition, could work to "naturally" help her fall asleep. However, she is unable to rely on the Product's advertising or labeling in the future, and so will not purchase the Product although she would like to. Additionally, Perkins may purchase P&G's ZzzQuil Pure Zzzs "naturally" labeled Products in the future as she would still like to purchase a product that truthfully "naturally" helps with sleep, and she may reasonably, but incorrectly, assume the Product was improved.

15.    Perkins did not notice any disclaimer, qualifier, or other explanatory statement or information on the Products' labels or packaging that contradicted the prominent "naturally" front-facing labeling representation or otherwise suggested

FIRST AMENDED CLASS ACTION COMPLAINT

that the Products do not "naturally" help with sleep. The fact that other non-active ingredients are in the Products did not contradict, or reveal to Perkins or other class members, that the Melatonin in the Products was synthetically created. At the time of Perkins' purchases, she did not know the Melatonin in the Products was synthetically manufactured and highly processed.

16.     P&G is a corporation headquartered and maintaining its principal place of business in the State of Ohio, and thus, is a citizen of Ohio. The unfair, unlawful, and misleading "naturally" claims on the Products were prepared, authorized, ratified, and/or approved by P&G and its agents, and were disseminated throughout California and the nation by P&G and its agents to deceive and mislead consumers in the State of California and the United States into purchasing the Products.

## REASONABLE CONSUMERS RELY ON THE "NATURALLY" ADVERTISING

17.     There is a strong consumer demand for products that are "natural" and free of highly processed, artificial, and synthetic ingredients. This demand is especially strong for "naturally" made dietary supplements. A recent survey of over 1,000 adults conducted by the Trust Transparency Center concluded that Americans favor "natural" dietary supplements over synthetically processed products and think synthetic supplements should be specifically labeled as "synthetic."[2] In fact, the results of the survey were so compelling that the founder of the Trust Transparency Center observed that "Consumers expect brands to be transparent with their materials and the results of this survey support that consumers want to know if the product they're buying is derived from synthetic material."[3] Similarly, the medical community has noted that "nutraceuticals of plant origin (plant-derived foods) tend

---

[2] Traci Kantowski, *New Survey Finds Consumers Skeptical of Synthetic Dietary Supplements; Favor Labeling on All Synthetic Vitamins and Supplements*, TRUST TRANSPARENCY CTR. (Sept. 5, 2018), https://trusttransparency.com/new-survey-finds-consumers-skeptical-of-synthetic-dietary-supplements-favor-labeling-on-all-synthetic-vitamins-and-supplements/ [https://perma.cc/7AD8-TZZV].
[3] *Id.*

to be more accepted by consumer than others."[4]

18.    In recent years, consumers have poured billions of dollars into the "natural" personal care market. Consumers value natural products for their perceived benefits of avoiding the perceived negative health effects of synthetic and artificial substances, attaining health and wellness, helping the environment, assisting local farmers, assisting factory workers who would otherwise be exposed to synthetic and hazardous substances, and financially supporting the companies that share these values.[5] As such, there is a recognized association among consumers and the concept of nature (e.g., "natural" products) and positive feelings associated with nature. Peer-reviewed and published research has found that the perceived naturalness of a product is "very important" to consumers.[6] In response to consumers' desire for natural products, many companies, including P&G, have rushed to manufacture, market, and sell purported "natural" products in an effort to gain market share. Unfortunately, rather than creating the natural products consumers desire, P&G has instead chosen to "greenwash" the Products and market them through deceptive labeling and advertising (i.e., the "naturally" advertising claims, green font, and natural imagery) to convince consumers the Products work "naturally" (i.e., the active ingredients are not synthetic). In reality, the Products work synthetically since the active ingredient is a synthetically created hormone. Consumers do not know this. P&G does not inform consumers that it uses the synthetic version of Melatonin in its Products. It simply lists "melatonin" on the label.

19.    A reasonable consumer understands the representation that a Product "naturally" helps sleep to mean that none of its active ingredients are synthetically

---

[4] Marino B. Arnao & Josefa Hernández-Ruiz, *The Potential of Phytomelatonin as a Nutraceutical*, 23(1) MOLECULES 238 (2018).
[5] *Id.*
[6] S. Roman et al., *The importance of food naturalness for consumers: Results of a systematic review*, 67 TRENDS FOOD SCI. & TECH. 44-57 (2017).

Case No. 25cv1305
FIRST AMENDED CLASS ACTION COMPLAINT

created. A synthetically created active ingredient (Melatonin) cannot and does not "naturally" help with sleep.

20.    Indeed, in an article titled *Natural vs. Synthetic Melatonin: Is There a Difference?*, the author explains that there are "key differences between natural vs. synthetic melatonin."[7] Natural Melatonin refers to the Melatonin your body manufactures or the Melatonin that is obtained by eating specific melatonin-containing foods such as cherries, grapes, walnuts, and tomatoes.[8] On the other hand, synthetic melatonin is created in a lab. It is also important for consumers to know if the Melatonin is synthetically or naturally created since taking the synthetic version can impact a user's natural melatonin production.[9]

21.    Despite its Products containing synthetic Melatonin, P&G reinforces the "naturally" claim by writing it in a bolded green font. Green is the universal visual cue used to trigger implicit ecological and natural inferences, "but green can be abused through greenwashing practices intended to mislead consumers."[10] Research has shown consumers "clearly associate the word and colour *green*" with "natural/organic ingredients" and production standards.[11]

22.    P&G also emphasizes the "naturally" claim through its use of natural imagery on the Product labels including images of chamomile and lavender.

23.    In response to an article about this action, numerous consumers expressed outrage about P&G's greenwashing and deceptive use of the "naturally" term on the front of the Product's label[12]:

---

[7] Dr. Aqus. M.D., N*atural vs. Synthetic Melatonin: Is There a Difference? available at* https://pillow.app/article/natural-vs-synthetic-melatonin-is-there-a-difference [https://perma.cc/P3YE-ZBDH].
[8] *Id.*
[9] *Id.*
[10] Dongjae Lim et al., *Colour effects in green advertising*, 44 INT'L J. CONSUMER STUD. 552 (2020).
[11] *Id.* at 553 (citing peer-reviewed published research).
[12] *See P&G ZzzQuil sleep aid class action alleges products falsely advertised as 'natural'*, TOPCLASSACTIONS.COM (Jan. 14, 2025), https://topclassactions.com/lawsuit-settlements/lawsuit-news/pg-zzzquil-sleep-

May 30, 2025 at 12:02 pm

Yes my kids have been taking this for years. Because I truly thought it was a natural melatonin at ages 4 and now 7 years later. What is natural! What is safe why do they false advertise these products. I have all the proof still has empty bottles receipts etc…. I'm livid!!!!

April 3, 2025 at 7:32 am

I have used these many times due to struggles with sleeping and pain management. I've been trying very hard not to add any other substances to my body and go the natural way with my autoimmune disorders. This is disappointing!!

April 3, 2025 at 5:26 am

We purchased this item twice because we thought it was natural.

March 31, 2025 at 9:15 pm

I purchased several times for family I see I'd misleading not natural

February 1, 2025 at 7:09 pm

Yes I have used / purchased P&G ZzzQuil Sleep Aids Lots of Times and I had to stop them bc I started depending on them . I was soon taking extra of them BC one minute it worked when I took the right dosage that the instructions said and the next minute I had to increase the dosage amount. Now I find out that nothing is natural ingredients in it.

January 30, 2025 at 6:13 pm

---

aid-class-action-alleges-products-falsely-advertised-as-natural/.

Me and my family use this product iid I would have known it wasn't all natural I wouldn't used it most of all the chemicals are very dangerous the company shouldn't have mislead me on to keep buying this product for my family and I.

January 28, 2025 at 11:07 am
Used these for a long time, didn't work too well for me ,, had to take more then acouple, i really thought they were made with natural ingredients.

January 23, 2025 at 2:09 pm
Thought it was natural

January 22, 2025 at 6:36 am
I used this product every night because it was all natural what a bunch of lies!

January 15, 2025 at 5:38 am
I have used this product many times assuming it was all natural product based on there labeling.

January 14, 2025 at 4:26 pm
I purchase by the statements of natural ingredients.

January 14, 2025 at 1:00 pm
I have used this a few times, and only because it said "natural"

January 14, 2025 at 10:22 am
I have previously used zzzquil as I took thought it was a natural sleepaid as stated but quickly found out it wasn't after taking it. I was sick the next day

and didn't get much sleep at all.

24.    A reasonable consumer's understanding of the term "naturally" comports with the common meaning of the terms, federal regulatory definitions, and the scientific community's knowledge.

25.    Webster's New World Dictionary defines "natural" as "produced or existing in nature; not artificial or manufactured."[13] Similarly, Dictionary.com defines "natural" as not "artificial."[14] The Merriam-Webster online dictionary defines "naturally" as "without artificial aid."[15]

26.    A recent consumer survey of more than 400 consumers nationwide conducted by an independent third party shows that 76.4% of those surveyed believed, based on the Product labeling, that the Product contains natural (instead of synthetic) melatonin. Ex. 2 at question 10. The same survey reveals that 65.4% of those surveyed would be more likely to purchase a sleep aid/supplement product if the primary ingredient was natural instead of synthetic. *Id.* at question 12.

27.    The "FDA agrees that the use of the word 'natural' on products that contain any artificial ingredients is inappropriate."[16] The FDA states that the term "natural" means "nothing artificial or synthetic."[17] The United States Department of Agriculture ("USDA") also states that the term "natural" means "(1) the product does not contain any artificial flavor or flavoring, coloring ingredient, or chemical preservative . . . or any other artificial or synthetic ingredient; and (2) the product

---

[13] SIMON & SCHUSTER, *Webster's New World Dictionary of the American Language* 947 (2d college ed. 1984) ("natural," definition no. 2).
[14] *See Natural*, DICTIONARY.COM (2023), https://www.dictionary.com/browse/natural [https://perma.cc/K9L4-9T9U].
[15] *Naturally*, MERRIAM-WEBSTER.COM (2024), https://www.merriam-webster.com/dictionary/naturally [https://perma.cc/7WEW-ECPS].
[16] Letter from Philip C, Spiller, DEP'T HEALTH & HUMAN SERVS., U.S. FOOD & DRUG ADMIN., to Urvashi Rangan & Michael Crupain, FOOD SAFETY & SUSTAINABILITY CTR., CONSUMERS UNION/CONSUMER REPS. (Dec. 11, 2014), *available at* https://advocacy.consumerreports.org/wp-content/uploads/2019/05/12_11_14_Letter_from_FDA_Caramel_Color-1.pdf.
[17] *Id.*

and its ingredients are not more than minimally processed."[18] The USDA recognizes that any "solvent extraction, acid hydrolysis, and chemical bleaching would clearly be considered more than minimal processing."[19] Congress has defined "nonsynthetic (natural)" as "[a] substance that is derived from mineral, plant, or animal matter and does not undergo a synthetic process . . . ." 7 C.F.R. § 205.2.

28.    The scientific community defines "synthetic" as "something that is man-made."[20] Published scientific literature provides a useful example: "chemically synthesized B12 vitamin . . . is not natural . . . (obtained from Nature), it is synthetic."[21] In other words, any man-made product is not present in nature and is not "natural" and therefore cannot influence the body "naturally."[22]

29.    Although there is no disclosure that the Products' active ingredient is synthetically made, any fine-print disclosure would contradict the express "naturally" representation on the front of the packaging. Further, a fine-print disclosure is not an effective or meaningful communication to consumers.[23]

---

[18] OFF. POL'Y, PROGRAM & EMP. DEV., FOOD SAFETY & INSPECTION SERV., U.S. DEP'T AGRIC., *Food Standards and Labeling Policy Book* (2024), *available at* https://www.fsis.usda.gov/sites/default/files/import/Labeling-Policy-Book.pdf.

[19] *Id.*

[20] Peter E. Nielsen, *Natural – synthetic – artificial!*, 1:1 ARTIFICIAL DNA: PNA & XNA 58-59 (2010).

[21] *Id.*

[22] *See id.*

[23] *See, e.g.*, Karen Russo France & Paula Fitzgerald Bone, *Policy Makers' Paradigms and Evidence from Consumer Interpretations of Dietary Supplement Labels*, 39(1) J. CONSUMER AFFS. 27-51 (2005); Marlys J. Mason et al., *The Impact of Warnings, Disclaimers, and Product Experience on Consumers' Perceptions of Dietary Supplements*, 41(1) J. CONSUMER AFFS. 74-99 (2007); Aaron S. Kesselheim et al., *Mandatory Disclaimers On Dietary Supplements Do Not Reliably Communicate The Intended Issues*, 34(3) HEALTH AFFS. 438-46, 445 (2015) ("We found ample evidence that such disclaimers are often misunderstood or ignored by consumers and had no effects on consumers' ability to understand messages about health care products and critically evaluate potentially unsupported statements about effectiveness or safety."); Tonya Dodge, *Consumers' perceptions of the dietary supplement health and education act: implications and recommendations*, 8 DRUG TESTING & ANALYSIS 407-09, 409 (2016) ("[R]esearch suggests that the labelling requirements of DSHEA have little reliable impact on consumer beliefs about the risk and effectiveness of dietary supplements.").

Reasonable consumers, like Perkins, do not notice such a fine-print, illegible disclosure, especially considering the bolded, highlighted, and prominent "Naturally" representation on the front label that would contradict the disclosure.

## COMPETITORS DO NOT USE "NATURAL" OR "NATURALLY" ADVERTISING

30.    The vast majority of P&G's competitors do not use the deceptive "naturally" labeling claim. P&G uses the "naturally" advertising to obtain an unfair competitive advantage over its competitors and to increase sales because consumers are willing to pay more for products which are advertised as "naturally" influencing the body. Below are several examples of other sleep-aids which do not implement deceptive "natural" advertising:

  

  

  

## **THE PRODUCTS ARE NOT NATURAL AND, THUS, CANNOT HELP YOU "NATURALLY" FALL ASLEEP**

31.    Despite P&G's advertising claims, the Products are not "natural" and, thus, do not and cannot "naturally" help one fall asleep. For example, testosterone is a natural hormone when made by the body, similar to the Melatonin that is made by the body, but taking exogenous testosterone is not a "natural" way to increase testosterone levels. The medical community states that "natural options" for

increasing testosterone are losing weight and eating healthy.[24] "Medication options" include consuming or absorbing synthetically created testosterone.[25] This is why it is called "testosterone replacement therapy" and not simply a product that "naturally" increases testosterone levels.

32.    Specific to the primary ingredient in the Products, Melatonin, the Mayo Clinic states that "[t]he term 'natural' means the hormones in the product come from plant or animal sources. They're not made in a lab."[26] The American Academy of Family Physicians explains for Melatonin "[t]here are two types: natural and synthetic (manmade). Natural melatonin is made from the pineal gland of animals. This form could be contaminated with a virus, so it's not recommended."[27]

33.    Melatonin, the primary ingredient in all the Products and printed on the front-facing label of the Products, is a non-natural, synthetically manufactured ingredient. Melatonin is made in a lab and is chemically synthesized, which requires the use of toxic solvents and catalysts. Melatonin is not extracted from natural sources. Melatonin was first isolated and characterized by the methoxy derivative of serotonin from bovine pineal tissue in an experiment which was published in 1960.[28] The experiment utilized 100 kg of bovine pineal glands to isolate Melatonin. The isolation required the use of the solvents methanol, ethanol, propanol, ethyl acetate, benzene, and heptane. Analytical grade petroleum ether was also utilized. Today, melatonin is not commercially synthesized from bovine pineal grands due to risks of viral contamination. Instead, it is synthesized utilizing abundantly

---

[24] UT SOUTHWESTERN MED. CTR., *How low testosterone treatment can help – and harm – a man's sex drive and fertility* (Jan. 6, 2021), https://utswmed.org/medblog/low-testosterone-symptoms-causes-treatment/ [https://perma.cc/V3P7-3AMT].
[25] *Id.*
[26] Tatnai Burnett, *Bioidentical hormones: Are they safer?*, MAYO CLINIC (Dec. 7, 2022), https://www.mayoclinic.org/diseases-conditions/menopause/expert-answers/bioidentical-hormones/faq-20058460 [https://perma.cc/UHY4-SQSK].
[27] AM. ACAD. FAM. PHYSICIANS, *Melatonin* (Aug. 2023), https://familydoctor.org/melatonin/ [https://perma.cc/7VST-SQQ3].
[28] Aaron B. Lerner et al., *Isolation of Melatonin and 5-Methoxyindole-3-acetic Acid from Bovine Pineal Glands*, 235(7) J. BIOLOGICAL CHEMISTRY 1992-97 (1960).

34.    For example, in 1960, Szmuszkovicz et al. reported two novel chemical pathways to synthesize Melatonin utilizing commercially available starting materials.[29] In the first synthesis, a displacement reaction was produced using 5-methoxyindole and cyanide, lithium aluminum hydride reduction, and acetylation.[30] In the second synthesis, 5-methoxyindole-3-aldehyde was condensed with nitromethane and the resulting unsaturated nitro compound was reduced with lithium aluminum hydride and acetylated.

35.    More recently, it was reported in *Synthetic Communications* that melatonin is synthesized by preparing phthalimide through a four-pot reaction which requires the use of microwave irradiation, a heating process which produces a higher Melatonin yield.[31] Phthalimide, the starting material for Melatonin synthesis, is produced from reacting phthalic anhydride and ammonia in a reaction tube at 250-80 degrees Celsius.[32]

36.    Exogenous Melatonin can be made from plants which has been recently called "Phytomelatonin" in a peer-reviewed article published in *Molecules*.[33] The authors explained the "differences between synthetic melatonin and phytomelatonin" in the publication. The authors explain for synthetically created Melatonin, like the Melatonin in the Products, "[t]here are various production

---

[29] J. Szmuszkovicz et al., *Synthesis of N-Acetyl-5-methoxytryptamine*, 25(5) J. ORG. CHEM. 857-59 (1960).

[30] Cyanide is toxic by skin absorption, ingestion, and inhalation. *See* NAT'L CTR. BIOTECH. INFO., NAT'L LIBR. MED., NAT'L INSTS. HEALTH, *Cyanide Ion*, PUBCHEM (accessed Dec. 26, 2024), https://pubchem.ncbi.nlm.nih.gov/compound/Cyanide-ion [https://perma.cc/26M2-2FVZ]. Lithium aluminum hydride is an inorganic compound and a well-known "reducing agent" in the field of organic chemistry. *See* A. E. Finholt et al., *Lithium Aluminum Hydride, Aluminum Hydride and Lithium Gallium Hydride, and Some of their Applications in Organic and Inorganic Chemistry*, 69(5) J. AM. CHEM. SOC'Y 1199-1203 (1947).

[31] Ling He, *Microwave Assisted Synthesis of Melatonin*, 33(5) SYNTHETIC COMMC'NS 741-47 (2003).

[32] Peter M. Lorz et al., *Phthalic Acid and Derivatives*, *in* ULLMANN'S ENCYCLOPEDIA OF INDUSTRIAL CHEMISTRY (2007).

[33] Arnao, *supra* note 4, at 238.

methods involving several synthetic routes."[34] These include chemical syntheses utilizing the precursor chemicals: 5-Methoxy-3-indolylacetonitrile, 5-Methoxy-3-(2-nitroethyl)-indole, 5-Methoxytryptamine, and Phthalimide.[35] The authors explain that these synthetic processes yield "a large number of side products, i.e., residual compounds of the melatonin preparation processes also appear."[36] The "most common of these which are present in the commercially available synthetic melatonin preparations"[37] are listed below[38]:

Table 4. Common contaminants in synthetic melatonin preparations.

| Contaminant Compounds |
| --- |
| 1,2,3,4-tetrahydro-β-carboline-3-carboxylic acid |
| 3-(phenylamino)alanine |
| 1,1′-ethylidenebis-(tryptophan) (so-called peak E) |
| 2-(3-indolylmethyl)-tryptophan |
| formaldehyde-melatonin |
| formaldehyde-melatonin condensation products |
| hydroxymelatonin isomers |
| 5-hydroxy-tryptamine derivatives |
| 5-methoxy-tryptamine derivatives |
| N-acetyl- and diacetyl-indole derivatives |
| 1,3-diphthalimidopropane |
| hydroxy-bromo-propylphthalimide |
| chloropropylphthalimide |

The authors note that "[u]p to 14 contaminants have been described in the organic synthesis of melatonin . . . ."[39] The authors further note that the phthalimide synthesis is "subject to multiple toxicological investigations,"[40] and "the fact that phthalimide is present in toxic compounds such as pesticides and fungicides, suggests that some degree of toxicity is to be expected."[41] As such, there is a "degree of risk involved in taking chemically synthesized melatonin supplements."[42] The

---

[34] *Id.* at 246.
[35] *Id.* at 247 (Table 3).
[36] *Id.* at 246.
[37] *Id.*
[38] *Id.* at 247 (Table 4).
[39] *Id.*
[40] *Id.* at 248.
[41] *Id.*
[42] *Id.*

authors note that there are products on the market that do not use synthetic melatonin and instead use the type that is derived from plants.[43]

37.    In 2023, several researchers published a peer-reviewed article in *Metabolites* detailing how industry is focused on developing more "natural" Melatonin products from sources such as algae and plants.[44] The article notes that these natural forms have the advantage of avoiding harmful chemical residues and better align with consumer expectations for products labeled or marketed as "natural." Accordingly, advertising a synthetic, chemically manufactured melatonin supplement as "naturally" helping with sleep misleads consumers into believing the product's active ingredient is derived from natural biological sources rather than artificial chemical synthesis.

38.    Consumers purchasing the Products believe—based on the words "helps you fall asleep naturally," the green/plant-based visual imagery, and other "natural" branding—that the sleep-aid contains an active ingredient derived from a biological, minimally-processed source. In fact, however, the Melatonin in the Products is chemically synthesized in a laboratory process and is not derived from plant, algae, or other natural sources. By labeling and marketing the Product as helping one fall asleep "naturally," P&G misleads reasonable consumers into paying a premium for a purportedly natural product when the active ingredient is the product of industrial chemical synthesis.

39.    Consumers lack the meaningful ability to test or independently ascertain the truthfulness of labeling claims such as "natural" and "naturally," especially at the point of sale. Consumers would not know the true nature of the ingredients merely by reading the ingredient label; its discovery requires

---

[43] *Id.* at 249; *see also id.* (Table 5).

[44] Arnao MB, Giraldo-Acosta M, Castejón-Castillejo A, Losada-Lorán M, Sánchez-Herrerías P, El Mihyaoui A, Cano A, Hernández-Ruiz J. Melatonin from Microorganisms, Algae, and Plants as Possible Alternatives to Synthetic Melatonin. Metabolites. 2023 Jan 2;13(1):72. doi: 10.3390/metabo13010072. PMID: 36676997; PMCID: PMC9862825.

investigation beyond the retail store and knowledge of chemistry beyond that of the average consumer.

40.    Further, P&G purposefully does not explain that the Melatonin it uses in the Products is not the natural type in the labeling and instead greenwashes its Products by using the "naturally" term in green font on the front and center of the Products' labels. It does this to increase sales. Reasonable consumers must and do rely on companies such as P&G to honestly report the nature of a supplement's ingredients, and companies such as P&G intend and know that consumers rely upon labeling statements in making their purchasing decisions. There is a reason P&G places the "naturally" claim prominently on the front label—to influence consumers' purchasing decisions when deciding to buy the Products.

41.    P&G's representation that the Products help you "naturally" sleep is a material representation because consumers attach importance to "naturally" claims when making purchase decisions, especially for products they consume like dietary supplements. P&G markets and advertises that the Products "naturally" help one to sleep in order to differentiate the Products from other sleep-aids, increase sales, and persuade consumers to purchase the Products. Perkins and the members of the Class were intended consumers of P&G's deceptive and misleading representation and reasonably relied to their detriment on P&G's misleading "naturally" representations.

42.    P&G's false, misleading, and deceptive misrepresentations are likely to deceive and mislead reasonable consumers and the general public. As a result of P&G's false, misleading, and deceptive representation that its Products "naturally" provide sleep, P&G injured Perkins and the members of the Class in that Perkins and the members of the Class: paid a sum of money for Products that were not as represented; were deprived of the benefit of the bargain because the Products they purchased were different from what P&G warranted; were deprived of the benefit of the bargain because the Products they purchased had less value than what P&G

represented; received Products that were of a different quality than what P&G promised; and were denied the benefit of truthful labels.

43.    Perkins and the members of the Class would not have purchased the Products if they had known that the Products cannot work "naturally" since the active ingredient is synthetic. Alternatively, Perkins and the members of the Class would not have purchased the Products at the price paid had they known that the Products contained an artificial and synthetic active ingredient and do not "naturally" provide sleep. Accordingly, Perkins and the members of the Class have suffered injury in fact, lost money or property, and suffered economic damages as a result of P&G's wrongful conduct.

44.    Perkins and the members of the Class seek damages and equitable relief, including, but not limited to, injunctive relief, restitution, and disgorgement.

## **THE IMPACT OF DEFENDANT'S WRONGFUL CONDUCT**

45.    P&G conveyed and continues to convey that the Products will "naturally" help you fall asleep, even though the Products' active ingredient is synthetic. Thus, the Products do not and cannot not "naturally" help you fall asleep because the active ingredient is not natural. A synthetic and highly processed active ingredient does not "naturally" influence the body.

46.    As the manufacturer and distributor of the Products, P&G possesses specialized knowledge regarding its content and effects of its ingredients, and P&G is in a superior position to know whether the Products are deceptively advertised. In fact, P&G acknowledges that its "ZzzQuil was developed by the trusted sleep experts at Vicks."[45]

47.    Specifically, P&G knew, but failed to disclose, or should have known, that the Products' "naturally" labeling is deceptive as the Products do not and cannot

---

[45] WALMART, *Vicks PURE Zzzs Melatonin Sleep Aid Gummies, 1mg, Dietary Supplement, 48 Ct* (2024), https://www.walmart.com/ip/Vicks-PURE-Zzzs-Melatonin-Sleep-Aid-Gummies-1mg-Dietary-Supplement-48-Ct/963752291.

help a person "naturally" fall asleep.

48.    P&G knew, but failed to disclose, or should have known, that the Products could only synthetically work.

49.    P&G knew, but failed to disclose, or should have known, that the Products primary ingredient is synthetically created by industrial processes and is not natural and is not produced by natural processes as the front-facing label indicates.

50.    Perkins and the Class members have been and will continue to be deceived by P&G's deceptive representations.

51.    P&G's affirmative "naturally" representations and omissions about the synthetic active ingredient were a material factor in influencing Perkins' and the Class members' decisions to purchase the Products. P&G's conduct has injured Perkins and the Class members because the Product's do not work "naturally" or influence sleep "naturally." Had Perkins and other reasonable consumers known this, they would not have purchased the Products or would not have paid the prices they paid.

52.    The Products retail for approximately $15 per unit. Because of P&G's unlawful and deceptive advertising, the Products have become one of the highest-selling products in the sleep-aid product category. P&G claims the Products are the "WORLD'S #1 SLEEP AID BRAND."[46]

## NO ADEQUATE REMEDY AT LAW

53.    Plaintiff and the Class members seek equitable relief, as no adequate remedy at law exists. The statutes of limitations for the causes of action pled herein vary. Class members who purchased the Products more than three years prior to the filing of the original complaint will be barred from recovery if equitable relief were not permitted under the UCL.

---

[46] *Id.*

54.    Legal remedies require more "stringent" proof, and are therefore harder to obtain, are not "equally prompt and certain."

55.    Plaintiff is pleading the UCL claim in the alternative and asserts entitlement to equitable relief to recover the amounts paid for the Product to the extent those amounts (in whole or in part) are deemed not recoverable as damages for Plaintiff's legal claims.

56.    Plaintiff lacks an adequate remedy at law if the amount of damages is less than the price paid for the goods and restitution and/or injunctive relief may also be more certain, prompt, and efficient than other legal remedies.

57.    The scope of actionable misconduct under the unfair prong of the UCL is broader than the other causes of action asserted herein. It includes P&G's overall unfair marketing scheme to promote and brand the Products with the "naturally" representations, across a multitude of media platforms, including the Products' labels and packaging, over a long period of time, in order to gain an unfair advantage over competitor products. The UCL also creates a cause of action for violations of law, and Perkins brings a claim for violation of the UCL's "unlawful prong." No other causes of actions allow this claim to proceed, and thus, there is no adequate remedy at law for this specific violation of the UCL's unlawful prong. Perkins' UCL unlawful prong claim does not rest on the same conduct as her other causes of action, and there is no adequate remedy at law for this specific claim. Perkins and the Class members may also be entitled to restitution under the UCL, while not entitled to damages under the CLRA (e.g., the CLRA is limited to certain types of plaintiffs (an individual who seeks or acquires, by purchase or lease, any goods or services for personal, family, or household purposes) and other statutorily enumerated conduct).

58.    Injunctive relief is appropriate on behalf of Perkins and members of the Class because P&G continues to misrepresent the Products with the "naturally" representations. Injunctive relief is necessary to prevent P&G from continuing to

engage in the unfair, fraudulent, and/or unlawful conduct described herein and to prevent future harm—none of which can be achieved through available legal remedies (such as monetary damages to compensate past harm). Injunctive relief, in the form of affirmative disclosures, is necessary to dispel the public misperception about the Products that has resulted from years of P&G's unfair, fraudulent, and unlawful marketing efforts. Such disclosures would include, but are not limited to, publicly disseminated statements that the Products' labeling misrepresentations are not true and providing accurate information about the Products' true nature; and/or requiring prominent qualifications and/or disclaimers on the Products' front label concerning the Products' true nature. An injunction requiring affirmative disclosures to dispel the public's misperception, and prevent the ongoing deception and repeat purchases, is also not available through a legal remedy (such as monetary damages). In addition, Perkins is *currently* unable to accurately quantify the damages caused by P&G's future harm, because discovery and Perkins' investigation have not yet completed, rendering injunctive relief necessary. Further, a public injunction is available under the UCL, and damages will not adequately benefit the general public in a manner equivalent to an injunction.

59.    It is premature to determine whether an adequate remedy at law exists. This is an initial pleading and discovery has not yet commenced and/or is at its initial stages. No class has been certified yet. No expert discovery has commenced and/or completed. The completion of fact/non-expert and expert discovery, as well as the certification of this case as a class action, are necessary to finalize and determine the adequacy and availability of all remedies, including legal and equitable, for Perkins' individual claims and any certified class or subclass. Perkins therefore reserves the right to amend this complaint and/or assert additional facts that demonstrate this Court's jurisdiction to order equitable remedies where no adequate legal remedies are available for either Plaintiff and/or any certified class

or subclass. Such proof, to the extent necessary, will be presented prior to the trial of any equitable claims for relief and/or the entry of an order granting equitable relief.

## **CLASS ALLEGATIONS**

60.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3) on behalf of the following class:

> **The Class.** All persons who purchased the Products for personal use in California within the applicable statute of limitations until the date class notice is disseminated.

61.    Excluded from the Class are: (i) Defendant and its officers, directors, and employees; (ii) any person who files a valid and timely request for exclusion; and (iii) judicial officers and their immediate family members and associated court staff assigned to the case.

62.    Plaintiff reserves the right to amend or otherwise alter the class definition presented to the Court at the appropriate time, or to propose or eliminate sub-classes, in response to facts learned through discovery, legal arguments advanced by P&G, or otherwise.

63.    The Class is appropriate for certification because Perkins can prove the elements of the claims on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

64.    <u>Numerosity</u>: The Class members are so numerous that joinder of all members is impracticable. Perkins believes there are thousands of consumers who are Class members described above who have been damaged by P&G's deceptive and misleading labeling of the Products as helping consumers to fall asleep "naturally."

65.    <u>Commonality and Predominance</u>: Common questions of law and fact affect all Class members, and common questions predominate. The questions of law and fact common to the Class members which predominate over any questions which may affect individual Class members include, but are not limited to:

a.    whether P&G is responsible for the conduct alleged herein which was uniformly directed at all consumers who purchased the Product;

b.    whether P&G's misconduct set forth in this First Amended Complaint demonstrates that P&G engaged in unfair, fraudulent, or unlawful business practices with respect to the advertising, marketing, and sale of the Product;

c.    whether P&G made false and/or misleading statements concerning the Product that were likely to deceive the public;

d.    whether Perkins and the Class are entitled to injunctive relief; and

e.    whether Perkins and the Class are entitled to money damages and/or equitable monetary relief under the same causes of action as the other Class members.

66.    Typicality: Perkins is a member of the Class she seeks to represent. Her claims are typical of the claims of each Class member in that every member of the Class was susceptible to the same deceptive, misleading conduct and purchased the Product. Perkins seeks relief under the same claims as the other Class members.

67.    Adequacy: Perkins is an adequate Class representative because her interests do not conflict with the interests of the Class members she seeks to represent; the consumer fraud claims are common to all other members of the Class, and Perkins has a strong interest in vindicating her rights; and Perkins has retained counsel competent and experienced in complex class action litigation, and she intends to vigorously prosecute this action. Perkins has no interests which conflict with those of the Class. The Class members' interests will be fairly and adequately protected by Perkins and proposed Class Counsel.

68.    Superiority: a class action is superior to other methods for the fair and efficient adjudication of this controversy, since individual joinder of all members

of the Class is impracticable and no other group method of adjudication of all claims asserted herein is more efficient and manageable. The prosecution of separate actions by individual Class members would create a risk of inconsistent and varying adjudications. The Class is properly brought and should be maintained as a class action because a class action is superior to traditional litigation of this controversy. A class action is superior to the other available methods for the fair and efficient adjudication of this controversy because:

a.  the joinder of hundreds of individual Class members is impracticable, cumbersome, unduly burdensome, and a waste of judicial and/or litigation resources;

b.  the individual claims of the Class members may be relatively modest compared with the expense of litigating the claim, thereby making it impracticable, unduly burdensome, and expensive to justify individual actions;

c.  when P&G's liability has been adjudicated, all Class members' claims can be determined by the Court and administered efficiently in a manner far less burdensome and expensive than if it were attempted through filing, discovery, and trial of all individual cases;

d.  this class action will promote orderly, efficient, expeditious, and appropriate adjudication and administration of Class claims;

e.  Perkins knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action;

f.  this class action will assure uniformity of decisions among Class members;

g.  the Class is readily definable and prosecution of this action as a class action will eliminate the possibility of repetitious litigation;

and

h.    Class members' interests in individually controlling the prosecution of separate actions is outweighed by their interest in efficient resolution by single class action.

69.    Additionally, P&G has acted or refused to act on grounds generally applicable to the Class thereby making final declaratory and/or injunctive relief with respect to the members of the Class as a whole appropriate.

70.    Perkins seeks preliminary and permanent injunctive and equitable relief on behalf of the Class, on grounds generally applicable to the Class, to enjoin and prevent P&G from engaging in the acts described, and to require P&G to provide full restitution to Perkins and Class members.

71.    Unless the Class is certified, P&G will retain monies that were taken from Perkins and the Class members as a result of P&G's wrongful conduct. Unless a classwide injunction is issued, P&G will continue to commit the violations alleged and the members of the Class and the general public will continue to be misled.

## FIRST CLAIM FOR RELIEF

### Violation of California's Consumers Legal Remedies Act

### CAL. CIV. CODE §§ 1750, *et seq.*

72.    Plaintiff realleges and incorporates by reference all allegations contained in this complaint, as though fully set forth herein.

73.    Perkins brings this claim under the CLRA individually and on behalf of the Class against P&G.

74.    At all times relevant hereto, Perkins and the members of the Class were "consumer[s]," as defined in California Civil Code section 1761(d).

75.    At all relevant times, P&G constituted a "person," as defined in California Civil Code section 1761(c).

76.    At all relevant times, the Products manufactured, marketed, advertised, and sold by P&G constituted "goods," as defined in California Civil Code section

1761(a).

77.    The purchases of the Products by Perkins and the members of the Class were and are "transactions" within the meaning of California Civil Code section 1761(e).

78.    P&G disseminated, or caused to be disseminated, through its advertising, false and misleading representations, including the Products' labeling that induce sleep "naturally," which they do not because the Products contain the synthetic active ingredient Melatonin. P&G's representations violate the CLRA in the following ways:

a.    P&G represented the Products have characteristics, ingredients, uses, and benefits which they do not have, CAL. CIV. CODE § 1770(a)(5);

b.    P&G represented the Products are of a particular standard, quality, or grade, which they are not, § 1770(a)(7);

c.    P&G advertised the Products with an intent not to sell the Products as advertised, § 1770(a)(9); and

d.    P&G represented that the subject of a transaction has been supplied in accordance with a previous representation when it has not, § 1770(a)(16).

79.    P&G violated the CLRA because the Products do not "naturally" help one sleep because they contain an artificial and synthetic active ingredient (Melatonin) as discussed in detail above. P&G knew or should have known the Products cannot "naturally" help one sleep because P&G created the Products using the artificial and synthetic form of Melatonin described above.

80.    P&G's actions as described herein were done with conscious disregard of Perkins' and the Class members' rights and were wanton and malicious.

81.    P&G's wrongful business practices constituted, and constitute, a continuing course of conduct in violation of the CLRA, since P&G is still

representing that the Products have characteristics which they do not have.

82.    Pursuant to California Civil Code section 1782(d), Perkins and the members of the Class seek an order enjoining P&G from engaging in the methods, acts, and practices alleged herein, and for restitution and disgorgement.

83.    Pursuant to California Civil Code section 1782, Perkins notified P&G in writing by certified mail of the alleged violations of the CLRA and demanded that P&G rectify the problems associated with the actions detailed above and give notice to all affected consumers of their intent to so act. P&G failed to rectify or agree to rectify the problems associated with the actions detailed herein and give notice to all affected consumers within 30 days of the date of written notice pursuant to section 1782 of the CLRA. Perkins therefore seeks actual, punitive, and statutory damages.

84.    Pursuant to section 1780(d) of the CLRA, below is an affidavit showing that this action was commenced in a proper forum.

## SECOND CLAIM FOR RELIEF

### Violation of California's Unfair Competition Law

### CAL. BUS. & PROF. CODE §§ 17200, *et seq.*

85.    Plaintiff realleges and incorporates by reference all allegations contained in this complaint, as though fully set forth herein.

86.    Perkins brings this claim under the UCL individually and on behalf of the Class against P&G.

87.    The UCL prohibits any "unlawful," "fraudulent," or "unfair" business act or practice and any false or misleading advertising.

88.    P&G committed unlawful business acts or practices by making the representations (which also constitutes advertising within the meaning of California Business & Professions Code section 17200), as set forth more fully herein, and violating the CLRA. P&G's unlawful conduct is ongoing and continues to this date.

89.    P&G committed "unfair" business acts or practices by: (1) engaging in

conduct where the utility of such conduct is outweighed by the harm to Perkins and the members of the Class; (2) engaging in conduct that is immoral, unethical, oppressive, unscrupulous, or substantially injurious to Perkins and the members of the Class; and (3) engaging in conduct that undermines or violates the intent of the consumer protection laws alleged herein.

90.    There is no societal benefit from false advertising. Perkins and the other Class members paid for a Product that is not as advertised by P&G. While Perkins and the other Class members were harmed, P&G was unjustly enriched by their false misrepresentations. As a result, P&G's conduct is "unfair," as it offended an established public policy. There were reasonably available alternatives to further P&G's legitimate business interests, other than the conduct described herein.

91.    P&G committed "fraudulent" business acts or practices by making the representations of material fact regarding the Products set forth herein. P&G's business practices as alleged are "fraudulent" under the UCL because they are likely to deceive customers into believing the Products "naturally" help with sleep when the Products are not natural and do not work naturally because they contain an artificial and synthetic active ingredient (Melatonin).

92.    Perkins and the other members of the Class have in fact been deceived as a result of their reliance on P&G's material representations. This reliance has caused harm to Perkins and the other members of the Class, each of whom purchased P&G's Products. Perkins and the other Class members have suffered injury in fact and lost money as a result of purchasing the Products and P&G's unlawful, unfair, and fraudulent practices.

93.    P&G's wrongful business practices and violations of the UCL are ongoing.

94.    Perkins and the Class seek pre-judgment interest as a direct and proximate result of P&G's unfair and fraudulent business conduct. The amount on which interest is to be calculated is a sum certain and capable of calculation, and

Perkins and the Class seek interest in an amount according to proof.

95.    Unless restrained and enjoined, P&G will continue to engage in the above-described conduct. Accordingly, injunctive relief is appropriate. Pursuant to California Business & Professions Code section 17203, Perkins, on behalf of herself and the Class, seeks (1) restitution from P&G of all money obtained from Perkins and the other Class members as a result of unfair competition; (2) an injunction prohibiting P&G from continuing such practices in the State of California that do not comply with California law; and (3) all other relief this Court deems appropriate, consistent with California Business & Professions Code section 17203.

## **REQUEST FOR RELIEF**

Plaintiff, individually, and on behalf of all others similarly situated, requests for relief pursuant to each claim set forth in this First Amended Complaint, as follows:

a.    declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiff as Class Representative and appointing the undersigned counsel as Class Counsel;

b.    ordering restitution and disgorgement of all profits and unjust enrichment that Defendant obtained from Plaintiff and the Class members as a result of Defendant's unlawful, unfair, and fraudulent business practices;

c.    ordering injunctive relief as permitted by law or equity, including enjoining Defendant from continuing the unlawful practices as set forth herein, and ordering Defendant to engage in a corrective advertising campaign;

d.    ordering damages for Plaintiff and the Class;

e.    ordering Defendant to pay attorneys' fees and litigation costs to Plaintiff and the other members of the Class;

f.    ordering Defendant to pay both pre- and post-judgment interest on any amounts awarded; and

g.    ordering such other and further relief as may be just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all claims in this First Amended Complaint so triable.

Date: October 24, 2025

**CROSNER LEGAL, P.C.**

By: _/s/ Craig W. Straub_
CRAIG W. STRAUB

Craig W. Straub
*craig@crosnerlegal.com*
Zachary M. Crosner
*zach@crosnerlegal.com*
9440 Santa Monica Boulevard, Suite 301
Beverly Hills, California 90210
Telephone: (866) 276-7637
Facsimile: (310) 510-6429

**REESE LLP**
George V. Granade (State Bar No. 316050)
*ggranade@reesellp.com*
8484 Wilshire Boulevard, Suite 515
Los Angeles, California 90211
Telephone: (310) 393-0070
Facsimile: (212) 253-4272

**REESE LLP**
Michael R. Reese (State Bar No. 206773)
*mreese@reesellp.com*
100 West 93rd Street, 16th Floor
New York, New York 10025
Telephone: (212) 643-0500
Facsimile: (212) 253-4272

*Counsel for Plaintiff Valerie Perkins and the Proposed Class*

Civil Code Section 1780(d) Affidavit

I am an attorney duly licensed to practice before all of the courts of the State of California. I am one of the counsel of record for Plaintiff. This declaration is made pursuant to § 1780(d) of the California Consumers Legal Remedies Act. Defendant has done, and is doing, business in California, including in this county. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed October 24, 2025, at San Diego, California.

1          By:      */s/ Craig W. Straub*

FIRST AMENDED CLASS ACTION COMPLAINT