UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VALERIE PERKINS, individually and on behalf of all others similarly situated,<br><br>          Plaintiff,<br><br>v.<br><br>THE PROCTER & GAMBLE COMPANY,<br><br>          Defendant. | Case No.: 25-CV-1305 TWR (VET)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**<br><br>(ECF No. 18) |

  Presently before the Court is Defendant The Procter & Gamble Company's Motion to Dismiss ("Mot.," ECF No. 18), as well as Plaintiff Valerie Perkins' Opposition to ("Opp'n," ECF No. 20), and Defendant's Reply in Support of ("Reply," ECF No. 21) the Motion.  The Court held oral arguments on Thursday, February 5, 2026.  (*See* ECF No. 22.)  Having carefully considered the First Amended Complaint ("FAC," ECF No. 15), the Parties' arguments, and the relevant law, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's Motion.

## BACKGROUND

### I. Factual Background

  Throughout 2022, Plaintiff purchased Defendant's "ZzzQuil Pure Zzzs" sleep-aid melatonin products (the "Products") from various retail stores in El Cajon, California.

(FAC. ¶ 13.) The Products prominently display the slogan "HELPS YOU FALL ASLEEP NATURALLY" on their front labels. (*See generally* ECF No. 15-1 ("Ex. 1").) For example, "Melatonin + Chamomile & Lavender Gummies" are sold in the following packaging:



(FAC ¶ 1.) Relying on the Products' labels, Plaintiff contends she purchased the Products in part because she believed the Products' active ingredient, Melatonin, works "naturally" and is not synthetic or artificial. (*Id.* ¶ 4.) But in reality, "[t]he Melatonin in the Products is a highly synthesized chemical which does not exist in nature and is not made by nature." (*Id.*) Plaintiff further contends that because "the melatonin ingredient is not 'natural,' it cannot 'naturally' help a consumer sleep." (*Id.*)

## II. Procedural Background

On October 24, 2025, Plaintiff filed the operative First Amended Complaint ("FAC")[1] asserting claims under California's Consumers Legal Remedies Act, Cal, Civ.

---

[1] Plaintiff's initial complaint ("Compl.," ECF No. 1-2) alleges that the Products' labels are "false, deceptive, and misleading" because "[a] reasonable consumer understands the representation that a Product 'naturally' helps sleep to mean that none of its ingredients are synthetically created" (*id.* ¶¶ 2, 18). The Court granted Defendant's motion to dismiss the initial complaint for failure to state a plausible claim of consumer deception. (*See generally* ECF No. 14 ("Prior Order").)

Code §§ 1750–1784 (the "CLRA"), and Unfair Competition Law, Cal. Bus & Prof. Code §§ 17200–17210 (the "UCL"). (*See generally id.*) Specifically, Plaintiff alleges that the Products' labels are "false, misleading, and likely to deceive reasonable consumers" because "[a] reasonable consumer would expect that a Product branded and labeled as 'naturally' being capable of inducing sleep would not contain a synthetic, artificial ingredient." (*Id.* ¶ 7.) On November 25, 2025, Defendant moved to dismiss the FAC. (*See* Mot.)

## LEGAL STANDARD

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted 'tests the legal sufficiency of a claim.'" *Conservation Force v. Salazar*, 646 F.3d 1240, 1241–42 (9th Cir. 2011) (quoting *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)). "A district court's dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is proper if there is a 'lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory.'" *Id.* at 1242 (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)). If the court dismisses a complaint for failure to state a claim under Rule 12(b)(6), the "court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly

be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122 (9th Cir. 2000) (quoting *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995)).

## DISCUSSION

### I. Plaintiff's New Consumer Deception Theory

#### A. Legal Standard

"Claims under [both the CLRA and UCL] are governed by the 'reasonable consumer' standard, which requires a plaintiff to 'show that members of the public are likely to be deceived' by the defendant's marketing claims." *Whiteside v. Kimberly Clark Corp.*, 108 F.4th 771, 777 (9th Cir. 2024) (quoting *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008)). "[T]he reasonable consumer standard requires a probability 'that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled.'" *Id.* (quoting *Ebner*, 838 F.3d at 965). Although "'California courts have recognized that whether a business practice is deceptive will usually be a question of fact not appropriate for decision at the pleadings stage[,]' . . . [d]ismissal is appropriate when 'the advertisement itself makes it impossible for the plaintiff to prove that a reasonable consumer is likely to be deceived.'" *Id.* (alterations adopted) (quoting *Williams*, 552 F.3d at 938–39).

As the Court explained in its prior order granting defendant's motion to dismiss Plaintiff's initial complaint, the Court begins by evaluating the Products' front label. (ECF No. 14 ("Prior Order") at 5 (citations omitted).) If the Court finds the front label cannot plausibly deceive a reasonable consumer in the manner alleged, the Court should dismiss the FAC for failure to state a claim. (*See id.* (citations omitted).) But if the Court finds the front label is unambiguously deceptive and could plausibly deceive a reasonable consumer in the manner alleged, then the Court should decline to dismiss the FAC. (*See id.* at 5–6 (citations omitted).) Finally, if the Court finds the front label is ambiguous, the Court may consider additional context available to the consumer (*e.g.*, the back-label ingredient list and knowledge of the reasonable consumer) to determine whether the label could plausibly deceive a reasonable consumer. (*See id.* at 6 (citations omitted).)

**B.    *Analysis***

Plaintiff argues the Products' front labels are unambiguously deceptive because the slogan "HELPS YOU FALL ASLEEP NATURALLY" could cause a reasonable consumer to believe none of the Products' active ingredients are synthetically created. (*See* FAC ¶¶ 4, 7, 19.) Plaintiff specifically takes issue with the fact that "the Products' active primary ingredient, Melatonin, is an artificial and synthetic ingredient." (*Id.* ¶ 4.) In response, Defendant raises two arguments. First, Defendant argues it is implausible that a reasonable consumer would equate the slogan "HELPS YOU FALL ASLEEP NATURALLY" with "natural" melatonin. (*See* Mot. at 11.) Second, Defendant argues—assuming the front label is ambiguous[2] and additional context is considered— a reasonable consumer would not understand the Products' front labels to pertain only to the melatonin ingredient. (*See id.*)

The Court begins by determining whether ambiguity exists regarding the definition of the word "naturally" as used in the Products' slogan. (*See* Prior Order at 6–7.) As stated in the Prior Order, "naturally" has two relevant definitions: (1) "according to the usual course of things; as might be expected," and (2) "without artificial aid." *Naturally*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/naturally (last visited Feb. 2, 2026). As a preliminary matter, the Court **MAINTAINS** its prior disposition that the first definition unambiguously supports Defendant's interpretation of the slogan—that is, the Products help one "fall asleep 'according to the usual course of things'" because the Products act upon the innate hormonal pathway by which the human body ordinarily induces sleep. (*See* Prior Order at 7.)

The second definition, however, requires further inquiry. As stated in the Prior Order, viewing the allegations in the light most favorable to Plaintiff, a reasonable consumer could interpret "fall asleep 'without artificial aid'" to mean "fall asleep 'without

---

[2]    In the Prior Order, the Court found the Products' front labels were ambiguous. (*See* Prior Order at 7 (citations omitted).)

artificial or synthetic ingredients.'" (*See* Prior Order at 7.) Accordingly, the Court **FINDS** the Products' front labels are—for purposes of the pleading stage—ambiguous because reasonable consumers would necessarily require more information before they could reasonably conclude whether the Products contain "natural" (instead of synthetic) melatonin. *See Moore v. Trader Joe's*, 4 F.4th 874, 882 (9th Cir. 2021); *see also McGinity v. Proctor & Gamble Co.*, 69 F.4th 1093, 1098–99 (9th Cir. 2023).

Finding the Products' front labels to be ambiguous, the Court must consider other information available to reasonable consumers to determine whether the label could plausibly deceive a reasonable consumer. *McGinity*, 69 F.4th at 1099; *Moore*, 4 F.4th at 882. "[When] a front label is ambiguous, the ambiguity can be resolved by reference to the back label." *McGinity*, 69 F.4th at 1099. As Plaintiffs point out, however, the back label does not inform consumers what type of melatonin the Products contain. (*See* FAC ¶ 10.) Rather, the back label simply lists "melatonin" as an ingredient:




(Ex. 1 at 2.) Because the back label does not resolve the ambiguity regarding the type of melatonin the Products contain, the Court **CONSIDERS** additional information available to the reasonable consumer. *See Moore*, 4 F.4th at 882.

Defendant contends that a reasonable consumer would not interpret the slogan "HELPS YOU FALL ASLEEP NATURALLY" as a claim about the "natural" origin of the melatonin ingredient. (Mot. at 11.) In support of this argument, Defendant asserts that a reasonable consumer understands the melatonin used in the Products is not extracted from humans or animals and thus must be produced synthetically. (*Id.*) In response, Plaintiff contends that a reasonable consumer has no idea how melatonin is produced but could nevertheless understand "naturally" to refer to the source of the melatonin (*i.e.*, that it is not synthetic). (*See* Opp'n at 12–13.) For the reasons below, the Court **AGREES** with Plaintiff.

As highlighted by Plaintiff, there are at least two types of exogenous melatonin that, if consumed, work to supplement the melatonin made by the human body: melatonin that is produced via chemical synthesis reactions in a laboratory and melatonin that is produced in plants (also called "phytomelatonin"). (*See* FAC ¶¶ 33, 36 (citations omitted).) Defendant argues that because there is a "common understanding" that melatonin is produced by the human body, and because the Products are intended to supplement endogenous melatonin, a reasonable consumer would not conclude the Products' melatonin is "natural" in origin. (Reply at 9 (citing *Moore*, 4 F.4th at 883–84.) But the fact that melatonin is produced by the human body does not necessarily imply that a reasonable consumer would understand that the melatonin in the Products is chemically synthesized.

At the hearing, Defendant argued that plant-based melatonin is not "natural" because it is made in a laboratory. (*See* ECF No. 22.) While Defendant is technically correct that plant-based melatonin *can be produced* in a laboratory, the extraction of plant-based melatonin is distinct from the chemical synthesis of melatonin. *Compare* Methods for Extracting Melatonin and Compositions Thereof, U.S. Patent Pub. No. 2025/0255923A1, Abstract (explaining "methods for extracting a purifying melatonin from natural melatonin sources" include "extracting melatonin from *Hypericum perforatum* [(*i.e.*, St. John's wort)] or from tomatoes"), *with* Synthesis Method of Melatonin, CN113214133A, Abstract (describing "a method for synthesizing melatonin" comprising "the steps of taking 5-

hydroxytryptamine hydrochloride as a raw material, carrying out methylation reaction on hydroxyl by a one-pot feeding method to obtain 5-methoxytryptamine, carrying out acetylation reaction on amino to prepare a melatonin crude product, and finally carrying out one-step refining and purification to obtain a finished product melatonin"). The primary distinction between these processes is that the former involves extracting already-made melatonin from a natural source (*e.g.*, a plant or plant derivative), whereas the latter involves combining materials to create melatonin. In other words, in extraction, melatonin is both a starting material and the end product. But in chemical synthesis, melatonin is only the end product.[3]

As in the Prior Order, the Court again finds *Gonzalez v. Chattem, Inc.*, No. 23-CV-00102-HSG, 2023 WL 8101923 (N.D. Cal. Nov. 21, 2023) instructive. As previously explained, the plaintiffs in *Gonzalez* brought consumer deception claims based on the defendant's melatonin products, which bore labels displaying the phrase "GET A GOOD NIGHT'S SLEEP, NATURALLY." *Id.* at *1. Ruling on the defendant's motion to dismiss, the *Gonzalez* court explained that "[w]hile the Product certainly makes no affirmative promise of being all-natural, viewing the allegations in the light most favorable to plaintiffs, a reasonable consumer might conclude that for a product to work 'naturally' with one's sleep cycle, the product's components must themselves be natural." *Id.* at *5. The *Gonzalez* court thus held, based on the allegations, it could not determine as a matter of law that "it would be implausible for a reasonable consumer to be misled into wrongly concluding . . . that the challenged ingredients were 'natural.'" *Id.* at *6. It further explained the plaintiffs' claims would "likely rise or fall based on their ability to prove that a reasonable consumer would not understand the challenged ingredients to be ['natural,']" which it found was "a separate question to be resolved at a later stage of litigation." *Id.*

---

[3] The Court takes notice of these facts pursuant to Federal Rule of Evidence 201. *See Anderson v. Kimberly-Clark Corp.*, 570 F. App'x 927, 932 n.3 (Fed. Cir. 2014) (citing *Hoganas AB v. Dresser Indus., Inc.*, 9 F.3d 948, 954 n. 27 (Fed. Cir. 1993) ("It is [] well-established that a court may take judicial notice of patents or patent applications.")

If Defendant does not understand the distinction between the extraction of melatonin from plants and the chemical synthesis of melatonin, the Court is not persuaded that a reasonable consumer would understand that distinction, either.[4]  The Court therefore **REJECTS** Defendant's assertion that a reasonable consumer necessarily understands the melatonin used in the Products "must be produced synthetically" (*see* Mot. at 11), and **FINDS** it is plausible that a reasonable consumer could be misled into wrongfully concluding that the slogan "HELPS YOU FALL ASLEEP NATURALLY" implies the Products' melatonin is "natural" (*i.e.*, not artificial or synthetic) in origin. *See Gonzalez*, 2023 WL 810923, at *5–6.

Defendant further argues Plaintiff's consumer deception theory is implausible because of the "significant price differential" between synthetic melatonin and phytomelatonin. (MTD at 15.)  Specifically, Defendant contends that one article cited in the FAC shows that phytomelatonin is "about *2000 times more expensive* than chemical melatonin." (*Id.* at 14 (quoting Marino B. Arnao et al., *Melatonin from Microorganisms, Algae, and Plants as Possible Alternatives to Synthetic Melatonin*, 13(1) METABOLITES 72 (2023)) (emphasis in original).)  Problematically, Defendant removes this quote from its context.  The article cited in the FAC states, in relevant part:

> [S]ome comments should be made about the costs and prices of products containing chemical/synthetic melatonin or phytomelatonin. Melatonin from chemical synthesis is currently very cheap, with the possibility of obtaining an acceptable quality at 95% purity for around EUR 0.25–0.3 per gram (or even cheaper). On the other hand, phytomelatonin requires the use of considerable amounts of raw material, plants, or algae, thus, having to process several kg of raw material to obtain a few mg. For example, if raw plants contain 5 μg of phytomelatonin·g DW$^{-1}$ (a considerable amount, see Table 2) from 1 kg of plants, we can obtain five pills of 1 mg of phytomelatonin.

---

[4]  As Plaintiff explains, exogenous melatonin can also be obtained by consuming melatonin-containing foods, such as cherries, grapes, walnuts, and tomatoes. (*See* FAC ¶ 20 (citations omitted).) The Court finds these facts more akin to the "basic understanding" of a reasonable consumer. *See Whiteside v. Chosen Foods*, LLC, 796 F.Supp.3d 667, 677 (S.D. Cal. 2025) (citing *Moore*, 4 F.4th at 881–85) (explaining reasonable consumers should have a "basic understanding" of the how the product they choose to purchase is produced).

> Assuming a price of about EUR 3 per kg of dried plant, the cost of 1 mg of phytomelatonin would be EUR 0.6, about 2000 times more expensive than chemical melatonin, all without taking into account the costs of handling plants and the extraction and concentration processes necessary to obtain appropriate richness in the extracts.

*Melatonin from Microorganisms, Algae, and Plants as Possible Alternatives to Synthetic Melatonin*, 13(1) METABOLITES 72 (2023). The article then states, "[s]urprisingly, we can find cheaper phytomelatonin pills on the market than chemical melatonin pills." *Id.*

The Court **FINDS** Defendant's reliance on this article to support its "significant price differential" argument unpersuasive.[5] *Cf. Moore*, 4 F.4th at 881–85 (finding the relatively inexpensive cost of the product in comparison to the cost of the ingredient at issue warranted the conclusion that the product's label was not misleading as a matter of law). Accordingly, the Court **REJECTS** Defendant's assertion that the "significant price differential" alone would inform a reasonable consumer that they are not purchasing "natural" melatonin. (Mot. at 15 (citing *Moore*, 4 F.4th at 884).)

In light of the foregoing, the Court cannot conclude as a matter of law that it is implausible a reasonable consumer would be misled into wrongfully concluding the Products contain melatonin that is "natural" (*i.e.*, not artificial or synthetic) in origin. *See*

---

[5] Defendant also contends that "one of the products identified in the article sells for $54.90 per bottle, while the FAC alleges that the purchase price for the Products is about $15.00 per bottle." (Mot. at 14–15.) In response, Plaintiff contends there are some commercially available "natural" melatonin supplements similar in price to the Products. (*See* Opp'n at 20). For example, Plaintiff explains that Solaray®, a plant-based melatonin supplement advertised as "non-synthetic" and "nature-derived," is available for purchase on Amazon for $14.99. (*See id.*)

Both arguments, however, rely on facts outside of the FAC. No where in the FAC (or the article cited therein) is there any mention of specific product pricing. There is also no mention of the existence of Solaray®, at least until Plaintiff's Opposition. The Court's "[r]eview is limited to the complaint" and "evidence outside of the pleadings . . . cannot normally be considered in deciding a [Rule] 12(b)(6) motion." *Cervantes v. City of San Diego*, 5 F.3d 1273, 1274 (9th Cir. 1993) (citations and internal quotations omitted). Moreover, "factual challenges to a plaintiff's complaint have no bearing on the legal sufficiency of the allegations under Rule 12(b)(6)." *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). For these reasons, the Court **DECLINES** to address the Parties' arguments regarding specific product pricing at this stage in litigation.

*Gonzalez v. Chattem, Inc.*, 2023 WL 8101923, at *5–6. Because the FAC states a plausible theory of consumer deception, the Court **DENIES** Defendant's Motion to Dismiss.

## II. Standing for Injunctive Relief

### A. Legal Standard

To have standing to seek injunctive relief, a plaintiff must "demonstrate a real and immediate threat of repeated injury in the future." *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 946 (9th Cir. 2011) (internal quotations omitted). A wronged plaintiff will be entitled to injunctive relief only if they can show they face a "real or immediate threat … that [they] will again be wronged in a similar way." *Mayfield v. United States*, 599 F.3d 964, 970 (9th Cir. 2010) (citations and internal quotations omitted). As explained by the Ninth Circuit, "a previously deceived consumer may have standing to seek an injunction against false advertising or labeling, even though the consumer now knows or expects that the advertising was false at the time of the original purpose." *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 969 (9th Cir. 2018). There are two ways a plaintiff can establish the required risk of future harm: "the consumer's plausible allegations that [they] will be unable to rely on the product's advertising in the future, and so will not purchase the product even though [they] would like to"; or "the consumer's plausible allegations that [they] might purchase the product in the future, despite the fact it was once marred by false advertising or labeling, as [they] may reasonably, but incorrectly, assume the product was improved." *Id.* at 969–70.

### B. Analysis

Defendant argues Plaintiff lacks standing to seek injunctive relief because she cannot allege a likelihood of future injury. (*See* Mot. at 10 (citing *Davidson*, 889 F.3d at 966–72).) Specifically, Defendant contends that because Plaintiff is now aware that the Products' melatonin is synthetically manufactured and that the slogan "HELPS YOU FALL ASLEEP NATURALLY" refers to the body's process, as opposed to the origin, of the melatonin, Plaintiff cannot be "wronged in the similar way" in the future. (*Id.* (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)).) In response, Plaintiff argues she

has sufficiently established the required risk of future harm such that she has standing to seek injunctive relief. (*See* Opp'n at 27–28 (citing *Davidson*, 889 F.3d at 970).) In particular, Plaintiff pleads:

> [She] would continue to purchase the Products at issue if they in fact contained only natural ingredients that, by definition, could work to "naturally" help her fall asleep. However, she is unable to rely on the Product's advertising or labeling in the future, and so will not purchase the Product although she would like to. Additionally, [she] may purchase [Defendant's] ZzzQuil Pure Zzzs "naturally" labeled Products in the future as she would still like to purchase a product that truthfully "naturally" helps with sleep, and she may reasonably, but incorrectly, assume the Product was improved.

(FAC ¶ 30.) For the reasons below, the Court **AGREES** with Defendant.

Once again, the Court finds *Gonzalez* instructive. 2023 WL 8101923, at *7–9. In *Gonzalez*, the plaintiffs argued their continued desire to purchase a sleep-aid supplement that works "naturally" as represented, but their inability to rely on the defendant's "naturally" advertising when deciding whether to purchase the product in the future, was sufficient to confer standing for injunctive relief under *Davidson*. *See id.* at 7. The *Gonzalez* court rejected the argument, finding it would be unreasonable for the plaintiffs to purchase the product as labeled in the future and assume the product was improved to deliver sleep "naturally," as the plaintiffs claimed they understood the term.[6] *Id.* at 9. The Court **FINDS** that the same analysis applies to Plaintiff's claim here.

In encountering the Products in the future, Plaintiff cannot "reasonably, but incorrectly" assume the Products have been "improved" because Plaintiff does not need to purchase the Products again to know whether the Products contain "natural" melatonin. *See Davidson*, 889 F.3d at 970–72; *see also Jackson v. Gen. Mills, Inc.*, 2020 WL 5106652,

---

[6] In *Gonzalez*, the plaintiffs alleged that they understood the modifier "NATURALLY" to indicate that at least the ingredients listed on the front label (*i.e.*, melatonin) were "natural," meaning not synthetic or artificial. *See* 2023 WL 8101923, at *1. In contrast, the defendant argued, *inter alia*, that a reasonable consumer would understand "naturally" to mean "without the aid of drugs," and not assume any correlation between how the Product works and the character of the ingredients that comprise it. *Id.* at *5.

at *5 (S.D. Cal. Aug. 28, 2020) ("[W]here a plaintiff learns information during litigation that enables her to evaluate product claims and make appropriate purchasing decisions going forward, an injunction would serve no meaningful purpose as to that plaintiff."). Because Plaintiff is now aware that the melatonin in Defendant's Products is not "natural" as she understands it to be, it would be unreasonable for Plaintiff to rely on the Products' use of "naturally" again in the future. *See Gonzalez*, 2023 WL 8101923, at *8–9. Thus, the Court **FINDS** that Plaintiff does not have standing to pursue injunctive relief.

      Plaintiff further argues that, if the Court finds she lacks standing to pursue injunctive relief, her injunctive relief claim should be remanded to the California Superior Court. (*See* Opp'n at 28 (citing *White v. BP Products N. Am., Inc.*, No. 5:24-CV-01827, 2024 WL 5247959, at *4–5 (C.D. Cal. Dec. 26, 2024)).) Defendant responds that because it has affirmatively waived an adequate-remedy-at-law objection (*see* Mot. at 20), the Court cannot remand Plaintiff's injunctive relief claim. (Reply at 14 (citing *Ruiz v. Bradford Exch., Ltd.*, 153 F.4th 907, 915–17 (9th Cir. 2025)).) Specifically, Defendant argues *Ruiz* stands for the proposition that, where a defendant does not present an adequate-remedy-at-law objection (or affirmatively waives it), a court is foreclosed from remanding a plaintiff's injunctive claim. (*See* Reply at 14; ECF No. 22.) But *Ruiz* is limited to instances in which "a plaintiff files a lawsuit in state court seeking *only* equitable relief and the case is properly removed to federal court." 153 F.4th at 918 (emphasis added). Indeed, "[w]hen a case is removed from state court and the district court concludes it lacks equitable jurisdiction, the court has the authority to remand the case to state court. The Court *is not required* to dismiss the case." *Id.* at 913 (emphasis added). Here, Plaintiff does not seek only equitable relief. (*See* FAC at 34.) Accordingly, it is within this Court's discretion as to whether to remand Plaintiff's injunctive claim. *See Ruiz*, 153 F.4th at 916.

/ / /

/ / /

/ / /

In deciding whether remand is appropriate, the Court considers whether Plaintiff would be barred from seeking injunctive relief in state court.[7]  *See, e.g.*, *Nixon v. Vegas.com, LLC*, No. 25-CV-05688-CRB, 2025 WL 3719885, at *11 (N.D. Cal. Dec. 23, 2025).  (denying partial motion to remand when the plaintiffs had time to refile in state court).  Because Plaintiff expresses no concern to this effect (*see* Opp'n at 29), the Court **DISMISSES WITHOUT PREJUDICE** Plaintiff's injunctive claim. *See White v. BP Prods. N. Am., Inc.*, No. 5:24-CV-01827-SPG-SK, 2024 WL 5247959, at *4 (C.D. Cal. Dec. 26, 2024) (explaining dismissal is appropriate where the court otherwise retains jurisdiction over some part of the complaint because "piecemeal remand in diversity cases is inappropriate") (quoting *Utne v. Home Depot U.S.A., Inc.*, No. 16-CV-01854-RS, 2022 WL 1443339, at *3 (N.D. Cal. May 6, 2022)).

## CONCLUSION

The Court **GRANTS IN PART** Defendant's Motion and **DISMISSES WITHOUT PREJUDICE** Plaintiff's injunctive claim.  The Court **DENIES IN PART** Defendant's Motion to the extent it seeks dismissal on grounds that Plaintiff does not plead a plausible theory of consumer deception.

**IT IS SO ORDERED.**

Dated: March 5, 2026

Honorable Todd W. Robinson
United States District Judge

---

[7] Plaintiff seeks injunctive relief pursuant to the UCL.  (*See* FAC ¶¶ 58, 95.)  The statute of limitations for a claim brought under the UCL is four years from the date of violation.  *See* Cal. Bus & Prof. Code §§ 17200, et seq.  Plaintiff alleges she purchased Defendant's products "[t]hroughout 2022." (FAC ¶ 13; *see also* ECF No. 24 at 2 (citing a declaration by Plaintiff stating she purchased the Products "near the end of the year 2022.").)